(C.D. 4218)

A. N. Deringer, Inc. *v.* United States

United States Customs Court, Second Division

(Decided May 18, 1971)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff. *L. Patrick Gray, III*, Assistant Attorney General (*Peter Jay Baskin*, trial attorney), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The merchandise involved in this case consists of children's waterproof snowsuits imported from Canada. They were assessed with duty at 42.5 per centum ad valorem under item 382.04 of the Tariff Schedules of the United States, as modified by Presidential Proclamation 3822 (Kennedy Round), 32 F.R. 19002, as other women's, girls' or infants' wearing apparel, ornamented, of man-made fibers. They are claimed to be dutiable at 24.5 per centum ad valorem under item 376.56, as amended by the Tariff Schedules Technical Amendments Act, Public Law 89–241, 77 Stat. 933, as garments designed for rainwear, hunting, fishing or similar uses, wholly or almost wholly, of fabrics (other than cotton) coated or filled, or laminated with rubber or plastics.

The entries involved herein were liquidated within 60 days after appraisement, but no appeal for reappraisement has been filed by either party; therefore, the liquidations remain valid. *John V. Carr & Son, Inc.* v. *United States*, 66 Cust. Ct. 316, C.D. 4209 (decided April 29, 1971).

The pertinent provisions of the tariff schedules, as modified and amended, are as follows:

> Garments designed for rainwear, hunting, fishing or similar uses, wholly or almost wholly of fabrics which are coated or filled, or laminated with rubber or plastics, which (after applying headnote 5 of schedule 3) are regarded as textile materials:
>
> \*    \*    \*    \*    \*    \*    \*
>
> 376.56  Other _____ 24.5% ad val.
>
> Women's, girls', or infants' lace or net wearing apparel, whether or not ornamented, and other women's, girls', or infants' wearing apparel, ornamented:
>
> \*    \*    \*    \*    \*    \*    \*
>
> 382.04   Of man-made fibers_____ 42.5% ad val.

Plaintiff called three witnesses at the trial: Victor Owen, vice-president of Kiddies' Togs Mfg. Co., Ltd., the manufacturer and exporter of the merchandise; Peter K. Nuessler, plant chemist for Consolidated Textiles, Ltd., the firm which produced the nylon fabric used in the garments; and James J. Clifford, general manager of Steadfast Rubber Company Canada, Ltd., the firm which coated the nylon fabric.

Mr. Owen testified that his duties include buying fabrics, supervision of plant operations, office procedures, and selling garments to Canadian and American customers. He was familar with the articles described on the invoices as waterproof snowsuits, identified by numbers 2030, 3030, and 4030. He stated that they are identical except for size and color. Samples were received in evidence as exhibits 1, 2, and 3. They consist of one-piece garments having pants and long-sleeves, each with a hood, zippered closings, and a belt. They are composed of an outer fabric and a quilted lining. The hood is lined with a pile fabric, and knitted cuffs extend from the sleeves. The outer shell is stitched to the lining at the neckline, down the front section of the zipper on each side; also at the bottom of the garment at the ankle, at the sleeves, and "at the outer ankle zipper on the other leg on each side of the zipper."

Mr. Owen testified that the outer shell was a neoprene waterproof coated nylon; that the lining was composed of rayon quilted with acrylic fibers and Johnson & Johnson backing to allow washability and to protect slippage, and that a pile lining was used for the hood. Samples of the nylon neoprene coated fabric and of the quilted lining were received in evidence as illustrative exhibits 4 and 5, respectively. The former was purchased from Consolidated Textiles, Ltd., at a

price of $1.775 per yard (exhibit 6) and the latter from Toronto Quilting & Embroidery, Ltd., at $0.72 per yard (exhibit 7).

Mr. Clifford testified that the nylon fabric was coated with a neoprene elastomer compound, plus accelerators, antioxidants, fillers, processing oils, plasticizers, and curing agents. Mr. Nuessler stated that neoprene is polymerized out of chloroprene, which is an organic substance and that it fell within the definition of "plastics materials" in headnote 3, part 1C of schedule 4 of the tariff schedules, and the definition of "synthetic plastics materials" in headnote 2, part 4A of schedule 4.

According to the testimony, the nylon side of exhibit 4 is the side which is bright green in color and has sheen or luster. The neoprene or coated side is dull and olive-gray in color. The nylon side forms the outer surface of the garment. The neoprene is non-transparent and changes the luster, color and sheen of the fabric and renders that side non-textile in appearance. It makes the fabric waterproof. Mr. Clifford explained:

> Without the coating on there, there would be very little hydrostatic water pressure tests. With a neoprene on there, we average about 80 pounds per square inch. It also gives the fabric a different feel. It gives it more body.
>
> Q. What do you mean by 80 pounds per square inch?—A. That is a way of measuring water or resistance to water.

Mr. Owen testified that he had seen snowsuits such as those involved herein used in the United States in the Glens Falls, N.Y. shopping area and in Burlington, Vermont. He stated:

> Well, they are worn by children to protect them from rain or snow, to protect them from the cold, protect them against the elements, you might say. They use them for playwear. It offers them warmth, waterproof features which were not common to most snowsuits. This is the greatest single element, perhaps, in the desirability and the practical aspect of this suit, the fact that it is a waterproof suit.

Mr. Owen did not sell these snowsuits in Miami, New Orleans or Texas because the temperatures there are considerably higher. He testified that the garments are used almost exclusively in colder climates because of the warmth creating elements, basically the quilted lining. The nylon neoprene offers waterproof elements, warmth, and wind resistance, and in combination with the quilted lining offers extra warmth. His firm does not sell this product in a cold climate without the quilted lining but he knows of other firms that do. He had not seen it used in the rain in the United States but he had seen it so used in Canada.

Mr. Owen had also seen hunting and fishing garments in use and testified as to them:

> They are constructed in such a way as to offer the hunter protection against rain, against the cold, what other elements that may exist. They may be used for hunting, but they could be used for other reasons. They could be used for skiing, snowmobiling. Essentailly [sic], a hunting garment is used as a means of protection, to protect the hunter against the elements; rain, water, sleet, snow.

In the opinion of Mr. Owen the nylon neoprene fabric gives the snowsuits their essential character, for the following reasons:

> Well, the sale of the item mushroomed on the strength of the nylon neoprene element in this fabric. It enhances the appearance of the garment. It gives children warmth. It gives them the element of waterproof features which were not common to snowsuits until a few years ago. It was wind resistant. It created tremendous sales appeal from mothers who were, let's say, in the past obliged to buy three suits in order to keep their children dry.

According to Mr. Owen the garment would not be waterproof snowsuit without the nylon neoprene. The main selling element is the neoprene.

In order for plaintiff to prevail it must establish that the involved snowsuits are (1) garments designed for rainwear, hunting, fishing, or similar uses, and (2) that they are made wholly or almost wholly of fabrics which are coated, or filled, or laminated with rubber or plastics, which are regarded as textile materials.

Although there is no specific testimony as to what the imported merchandise was *designed* for, it is evident from the samples, the record, and common knowledge that they are intended for and used by children in cold climates in winter weather when snow is likely to be falling or on the ground, in order to keep the wearers dry and warm. It is also common knowledge that when children are outdoors in wintertime, they will play in the snow and their outer clothing becomes wet.

When the tariff schedules were originally enacted, they provided in items 376.50–376.58 for rainwear of textile materials and rubber or plastics. By the Tariff Schedules Technical Amendments Act of 1965, the provision was expanded to include garments designed for rainwear, hunting, fishing, or similar uses. The Report of the Ways and Means Committee in connection with that Act (House of Representatives Report No. 342, 89th Congress, 1st Sess., p. 12) states:

> * * * This amendment is related to the proposed changes affecting articles which are wholly or in part of fabrics covered with nontransparent rubber or plastics. The amendment specifi-

cally mentions, in addition to rainwear, other related garments made wholly or almost wholly of such fabrics. * * *

The provision is thus not limited to garments which afford protection against rain but includes wearing apparel used in outdoor sports activities, such as hunting or fishing, which may be carried on in inclement weather or in or upon water, and where protection from moisture and dampness is desirable. In our view waterproof snowsuits which are used to protect the wearer from the effect of cold and snow while engaged in outdoor activities are related garments and fall within the language, garments designed for rainwear, hunting, fishing, or similar uses.

The next question is whether these snowsuits are composed "wholly or almost wholly of fabrics which are coated or filled, or laminated, with rubber or plastics, which (after applying headnote 5 of schedule 3 [1]) are regarded as textile materials."

According to the record, the nylon neoprene fabric is a fabric which has been coated with plastics material and which, in view of the way it is used in the garment, is regarded as a textile material within the meaning of headnote 5 of schedule 3. The issue is whether these snowsuits are almost wholly of such fabric within the meaning of the tariff statute.

The phrase "almost wholly of" is defined in General Headnote 9 (f) (iii) as follows:

> (iii) "almost wholly of" means that the essential character of the article is imparted by the named material, notwithstanding the fact that significant quantities of some other material or materials may be present;

The meaning of this term was discussed in *United China & Glass Co.* v. *United States*, 61 Cust. Ct. 386, C.D. 3637, 293 F. Supp. 734 (1968), where the merchandise consisted of a glass ball on a plastic base with a decorative plastic flower insert made of artificial flowers. The question was whether the glass ball or the plastic flowers imparted the essential character to the article. The court said (pp. 389–390) :

> * * * The character of an article is that attribute which strongly marks or serves to distinguish what it is. Its essential character is that which is indispensable to the structure, core or condition of the article, i.e., what it is. Webster's Third New International Dictionary, 1966 edition. The article, exhibit 1, has several distinguishing characteristics, namely, the glass ball

---

[1] For the purposes of parts 5, 6, and 7 of this schedule and parts 1 (except subpart A), 4, and 12 of schedule 7, in determining the classification of any article which is wholly or in part of a fabric coated or filled, or laminated, with nontransparent rubber or plastics (which fabric is provided for in part 4C of this schedule), the fabric shall be regarded not as a textile material but as being wholly of rubber or plastics to the extent that (as used in the article) the nontransparent rubber or plastics forms either the outer surface of such article or the only exposed surface of such fabric.

and decorative insert of plastic flowers. "[T]he factors to be taken into consideration in determining whether certain merchandise is to be classified under the relevant provision for artificial flowers, fruits, etc., are not limited to 'closeness of simulation and suitability to the ornamental uses of real flowers' but also '[include] others such as *size*, primary function, other recognized names, uses and applicable tariff act provisions, and *ordinary common sense*.' " [Emphasis quoted.] "The situation must be reviewed as a whole." *Robaire Import Company* v. *United States*, 60 Cust. Ct. 176, C.D. 3307.

The indispensable and distinguishing part, that which imparts the essential character of the structured article say this litigation is, in our opinion, the glass ball. We say this because, if we take the glass ball away, we are left with (1) some plastic flowers set in a rubber cap and (2) a plastic base, neither of which has any utility, so far as the record shows, without the glass ball. Indeed, any decorative insert could quite easily be substituted in place of the plastic flowers without destroying the essential character of the article as manifest in the glass ball. * * * The invoice and catalogue descriptions, "Glass Water Balls" and "Decorative Water Ball", are also persuasive indicia that the essential character of the article is imparted by the glass ball. For it is not uncommon that an article is called by the name denoted by its essential character, viz, chair, table, etc. * * *

In *Larry B. Watson Co., a/c Decoration Products Co.* v. *United States*, 64 Cust. Ct. 343, C.D. 4001 (1970), the merchandise consisted of polyvinyl chloride film, colored or metallized on one or both sides, and the issue was whether the polyvinyl chloride or the metallized or colored lacquer imparted the essential character to the article. The court stated:

> The uncontradicted testimony reveals clearly that the characteristics of the imported film which make it desirable for the manufacture of decorations are its flexibility, its ease of die cutting and the fact that it is flameproof. These are the features or characteristics which distinguish it from other merchandise used for the same purpose, and these qualities are imparted by the polyvinyl chloride. * * *

In the instant case the snowsuits are composed of a neoprene nylon fabric which supplies the waterproof character to the garments and a quilted lining which supplies the warmth. According to Mr. Owen, the garment would not be a *waterproof* snowsuit without the nylon neoprene; therefore, he concluded that that fabric furnished the essential character to the article. Defendant claims, on the other hand, that without the quilted lining the article would not be a *snowsuit*.

A snowsuit has been defined as a child's lined outer garment for winter wear, similar to a ski suit, either in one piece or consisting of ankle length pants and a short, snug jacket. Webster's Third

New International Dictionary; Reader's Digest Great Encyclopedic Dictionary. Obviously, one essential characteristic of a snowsuit is that it offers warmth to the wearer. The instant merchandise, however, has the added feature of being waterproof. The invoices describe the articles as waterproof snowsuits. Mr. Owen's testimony indicates that waterproof features were not common to snowsuits until a few years ago. Thus, the imported snowsuits offer not only warmth to the wearer, but also water resistance. The latter characteristic distinguishes them from other snowsuits and makes them what they are. Therefore, that quality furnishes the essential character to the articles. Since that element is supplied by the coated nylon neoprene fabric, these snowsuits are "almost wholly of" that fabric within the meaning of the tariff schedules.

We conclude, therefore, that the merchandise involved herein is composed almost wholly of a fabric which is coated with plastics, which (after applying headnote 5 of schedule 3) is regarded as a textile material. It is properly dutiable under item 376.56 of the tariff schedules, as amended, at 24.5 per centum ad valorem. The protest is sustained and judgment will be entered for the plaintiff.